UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                 Case No. 12-20149

vs.                                                        Hon. Mark Goldsmith

MARCUS LEMAR HARRISON,

        Defendant.
_____/

## ORDER FINDING THAT DEFENDANT VIOLATED
## SUPERVISED RELEASE CONDITION

Defendant Marcus Lemar Harrison pleaded guilty to felon in possession of a firearm (Dkt. 16). He was sentenced to a custodial sentence of forty-six months, to be followed by a three-year term of supervised release. Harrison's supervised release began on September 19, 2016 (Dkt. 18). Shortly before Harrison's supervised release was set to expire, Harrison's probation officer filed a Petition for Warrant, alleging that Harrison made the following supervised release violations:

1. Committing home invasion and assault with a knife (Violation 1);

2. Driving on a suspended license (Violation 2); and

3. Possessing a controlled substance (Violation 3).

8/30/19 Order with Petition for Issuance of Warrant for Violation (Dkt. 18). Harrison was arrested and ordered detained pending a supervised release violation hearing (Dkt. 24). For the reasons that follow, the Court finds that the Government has established, by a preponderance of the evidence, that Harrison violated the conditions of his supervised release.

A district court may revoke a term of supervised release if it finds "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C § 3583(e)(3); see also United States v. Cofield, 233 F.3d 405, 406 (6th Cir. 2000) (same). Harrison's supervised

release conditions state, among other things, that Harrison must "not commit another federal, state or local crime." Judgment at 4 (Dkt. 16).

A supervised release hearing was held on October 17, 2019. During the hearing, defense counsel objected to certain testimony as hearsay. The Court allowed the testimony to be heard, but directed the parties to submit post-hearing briefs setting forth their respective positions on the hearsay objections. Both the Government and Harrison filed briefs (Dkts. 30-31, 33).

During the hearing, Harrison admitted to Violations 2 and 3. 10/30/19 Hr'g Tr. at 66 (Dkt. 29). With respect to Violation 1, the Government called Mount Morris Township police officer MacKenzi Dunklee to testify. Id. at 7-8. Dunklee testified that on August 26, 2019, she was dispatched to the Vanderbilt Apartments in response to a 911 call, where a woman reported a stabbing. Id. at 9. When Dunklee arrived at the apartments, she saw a man, later identified as J.D. Napier, bleeding profusely from his hand standing next to a vehicle with slashed tires. Id. at 9-10; see also Gov. Hr'g Ex. A (picture of slashed tires and puddles of blood). Dunklee asked Napier what happened and who was involved, but Napier refused to identify his assailant. 10/30/19 Hr'g Tr. at 10. Shortly thereafter, an ambulance arrived and took Napier to the hospital. Id. at 10-11.

After Napier departed, Dunklee followed the blood trail to Victoria Webster's apartment. 10/30/19 Hr'g Tr. at 11; see also Hr'g Ex. B (pictures of blood leading to an apartment). Webster was the person who placed the 911 call. 10/30/19 Hr'g Tr. at 11; see also 911 Call Tr., Ex. I to Gov. Br, at 1 (Dkt. 31-1). Dunklee testified that there was blood throughout Webster's apartment. 10/30/19 Hr'g Tr. at 14; see also Hr'g Exs. C-E (pictures of blood in the apartment). She followed the blood trail upstairs to one of the bedrooms. 10/30/19 Hr'g Tr. at 15. According to Dunklee, it appeared that the stabbing had occurred in the bedroom closet. Id.

Webster reported the following during the 911 call:

**Operator**: Okay what's going on there?

**Webster**: Uh, my kid's, uh, dad stabbed my friend.

2

**Operator**: He stabbed him?

**Webster**: Yeah.

**Operator**: Oh okay, is he okay? What, where did he stab him at?

**Webster**: In his hand.

**Operator**: Okay, alright. Where does the guy who, where is the trouble at now?

**Webster**: Huh?

**Operator**: Where is the trouble at now, the person who stabbed him?

**Webster**: I don't know I just need y'all to come here right now.

**Operator**: I'm working on it right now okay. What is your name?

**Webster**: My name[ is] Victoria Webster.

. . .

**Operator**: Okay. Alright. Do you know if he has the knife on him still, by any chance?

**Webster**: I don't know. I don't know what's . . . no, I don't know where he went or anything.

**Operator**: Okay, and what kind of knife was it?

**Webster**: He broke in my house. He took the knife out my house.

**Operator**: Oh, so it's like a kitchen knife?

**Webster**: Yes. I was upstairs in my room in my bed.

911 Call Tr. at 1-2.[1]

---

[1] An emergency 911 call made immediately after a startling event is admissible as a present sense impression. United States v. Davis, 577 F.3d 660, 668-669 (6th Cir. 2009). A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). Even a statement made five minutes after the startling event can fall within this hearsay exception. Davis, 577 F.3d at 668 n.5. Here, it is clear from the immediacy of the call that Webster reported the stabbing within five minutes of the event. Therefore, Webster's statements to the 911 operator fall within the present sense impression exception to the rule against hearsay.

Webster provided Dunklee with Harrison's name, date of birth, and phone number (ending in 1016). 10/30/19 Hr'g Tr. at 16. Timothy Clolinger, a United States probation officer who had supervised Harrison for more than two years, verified that the 1016 phone number belonged to Harrison. Id. at 57. Clolinger also testified that Harrison and Webster had been in a romantic relationship, had two children together, and had lived together at three different residences. Id. Webster placed a call to the 1016 phone number, which Dunklee observed and noted the phone number in his report. Id. at 17. Webster allowed Dunklee to listen to the conversation on the phone's speaker. Id. The man who answered the call refused to disclose his location to Webster because he said that Webster would "rat him out." Id. The man then asked what happened to the guy in the house? Id. When Webster said that he was on his way to the hospital, the man laughed and asked where he "got him," which Dunklee understood to mean stabbed. Id. Based on the phone number and the context of the call, it is clear that Harrison was on the other end of Webster's phone call.

Because Dunklee's testimony was credible and supported by corroborating evidence (photographs, Webster's 911 call, Dunklee's observation of Webster's phone call, Clolinger's identification of Harrison's phone number, and Harrison's admissions in the phone call), the Court finds that the Government has established, by a preponderance of the evidence, that Harrison assaulted Napier with a knife on August 26, 2019, in violation of his supervised release conditions.

SO ORDERED.

Dated: March 17, 2020  
    Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge